UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH KIM,

      Plaintiff,                      Civil Action No. 12-11694

v.                                 HON. JOHN CORBETT O'MEARA
                                 U.S. District Judge
                                 HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

    Plaintiff Kenneth Kim brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his  application for Disability Insurance Benefits ("DIB") under Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend  that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding this case for an award of benefits.

## PROCEDURAL HISTORY

    On June 25, 2009, Plaintiff's legal guardian filed an application for DIB on his ward's behalf, alleging an disability onset date of December 6, 2005 (Tr. 130-131, 137-138). After the initial denial of the claim, Plaintiff, through his legal guardian, requested an administrative hearing, held on October 13, 2010 in Chicago, Illinois before Administrative Law Judge (ALJ) Paul Armstrong. Plaintiff (Tr. 44). Plaintiff, represented by attorney Marc Littman, testified by video conference (Tr. 46-73), as did Vocational Expert ("VE") Harry

Cynowa (Tr. 72-83).  On January 14, 2011,  ALJ Armstrong found Plaintiff not disabled (Tr. 36).  On February 21, 2012, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on April 17, 2012.

## BACKGROUND FACTS

Plaintiff, born September 16, 1967, was 43 when the ALJ issued his decision (Tr.  36, 137).  He graduated from college and worked previously as a insurance claim team manager (Tr. 172, 181).  He alleges disability as a result of a traumatic brain injury sustained in a 2008 automobile accident (Tr. 171).

### A.      Plaintiff's Testimony

Plaintiff reported that his 2008 and 2009  income reflected sick leave pay from his former employer (Tr. 47).  He stated that he owned rental property that was currently in foreclosure (Tr. 47).  He stated that although he had sole custody of his two children following a divorce, he was now unable to support his children and had sent them to live temporarily with his former wife (Tr. 48).  Plaintiff testified that his son also sustained a head injury in the 2008 automobile accident and required psychiatric counseling (Tr. 49).  Plaintiff alleged that he experienced difficulty understanding the questionnaires he was required to complete to obtain psychiatric treatment for his son (Tr. 49).

Plaintiff testified that he had been taking Dilantin after experiencing seizures in  2009, adding that he had another episode in March, 2010 (Tr. 50-51).  He reported he lived with his 76-year-old father who drove him to appointments (Tr. 52).  Plaintiff acknowledged that he had a Facebook page and used a computer but that he was unable to concentrate for more than 15 to 20 minutes (Tr. 52).  He reported "constant headaches,"  short term memory loss, anxiety in public places, and intermittent upper extremity shaking (Tr. 54-55).  He stated that he had been diagnosed with double vision and had an aneurysm behind one eye

(Tr. 56-57). He testified that despite cervical spine surgery, he experienced nerve problems in his hands and Carpal Tunnel Syndrome ("CTS") (Tr. 58). Plaintiff opined that his memory problems, combined with his inability to drive, prevented him from working (Tr. 60). He stated that if he had access to transportation and was limited to unskilled work, he "would certainly give it [his] best" (Tr. 60). Plaintiff stated that he had attempted to go back to his job following the accident, but was terminated after experiencing a seizure at work (Tr. 64). Plaintiff testified that his admittance for inpatient psychiatric treatment resulted from his attempt to joke with a pharmacist (Tr. 66-67).

In response to questioning by his attorney, Plaintiff opined that his inability to concentrate precluded all work (Tr. 68). He stated that he enjoyed reading historical novels and spent most of his waking hours taking care of his pets and interacting with his father (Tr. 68-70). He indicated that medication side effects obliged him to take two or three naps every day (Tr. 71). He stated that he was unable to cook due to his tendency to forget to turn off the stove (Tr. 71). He alleged constant dizziness and the inability to walk in a straight line (Tr. 72). He stated that as a result of his mental confusion, his father and daughter had to administer his medications (Tr. 79). He testified that he was currently taking Cymbalta, Celexa, Quanipin, and Ambien (Tr. 80).

### B.   Medical Evidence

#### 1. Treating Sources

October, 2005 physical therapy records state that Plaintiff experienced headaches and neck pain (Tr. 207). June, 2007 treating records show that Plaintiff took Vicodin for back pain (Tr. 506). December, 2007 urgent care notes state that Plaintiff was depressed as a result of an impending divorce (Tr. 499).

In January, 2008, Plaintiff sustained injuries in an automobile accident resulting in a

loss of consciousness (Tr. 209-210, 503, 1009-1016). Two days after the accident, he sought emergency treatment for lightheadedness, back pain, dizziness, and headaches (Tr. 210). A CT of the brain was negative for injuries (Tr. 213). The same month, Elizabeth C. Smith, M.D. noted that Plaintiff was currently taking Vicodin and Percocet for cervical spine and upper extremity pain (Tr. 221). She recommended conservative treatment (Tr. 224). The following month, an MRI of the cervical spine showed a disc herniation (Tr. 220). Alan Robertson, M.D. observed that Plaintiff experienced difficulty formulating and articulating his thoughts (Tr. 302). He recommended replacement services due to Plaintiff's cognitive limitations resulting from the automobile accident (Tr. 304). Dr. Robertson prescribed Oxycontin (Tr. 307). In March, 2008, Stephen E. Boodin, M.D. found that the cervical disc herniation did not effect the spinal cord (Tr. 1040). April, 2008 nerve conduction studies showed mild radiculopathy at C-5-C6 (Tr. 245). Dr. Robertson's notes from the following month state that Plaintiff was using prescription medication inappropriately secondary to the brain injury (Tr. 308, 507, 1085). Dr. Robertson refused to prescribe additional pain medicine until Plaintiff had a "24/7 caregiver" (Tr. 308, 636).[1] Also in May, 2008, Fernando G. Diaz, M.D. recommended a discectomy of the cervical spine, noting reports of upper extremity pain and hand numbness (Tr. 231, 888). The same month, a discectomy was performed without complications (Tr. 248-249). Plaintiff sought emergency treatment for an elevated temperature the following week (Tr. 729). He was administered antibiotics (Tr. 745). Psychologist Jay Inwald's June, 2008 treating notes indicate that Plaintiff exhibited uncharacteristic irritability and profane language (Tr. 280). The same month, Dr. Inwald completed an neuropsychological evaluation of Plaintiff, noting impaired memory skills (Tr.

---

[1] A guardian was appointed, and the guardian filed Plaintiff's application for disability benefits.

1176). Plaintiff motor functioning was deemed moderately impaired (Tr. 1177). Dr. Inwald found impairments in attention, concentration, processing speed, executive functioning, language abilities, memory, sensoriperceptual, and motor functioning (Tr. 1179). He noted symptoms consistent with a Posttraumatic Stress Disorder ("PTSD") (Tr. 1179).

In July, 2008, post-surgical imaging studies of the cervical spine were unremarkable (Tr. 239). The same month, cognitive therapy notes state that Plaintiff exhibited a short attention span (Tr. 286). Also that month, treating notes state that Plaintiff fell down a flight of stairs after experiencing vertigo (Tr. 623). Dr. Robertson recommended that Plaintiff apply for disability benefits (Tr. 314). The following month, Plaintiff attributed his mental slowness to medication side effects (Tr. 288). Neurologist Steven H. Schecter, M.D. examined Plaintiff, noting complaints of headaches and memory problems since the January, 2008 accident (Tr. 696-697). Undated post-surgical treating notes state that Plaintiff was currently taking Oxycontin (Tr. 259). Dr. Inwald opined that allowing Plaintiff to return to work would be an "acceptable risk," given Plaintiff's motivation to work and improvement in cognitive skills (Tr. 1166). The same month, neurologist Gerald A. Shiener, M.D. found Plaintiff's prognosis for recovery from the frontal lobe traumatic brain injury "guarded" (Tr. 1256). Dr. Shiener noted that "[a] careful review of his psychosocial history reveals that [Plaintiff] was functioning well and without impairment prior to the accident" (Tr. 1256).

In September, 2008, his cognitive therapist, noting that Plaintiff faced termination if he did not return to work, opined that he required rest periods for fatigue upon returning to full-time work (Tr. 294-295, 1167). His therapist assigned him memory exercises to assist his transition to restarting work (Tr. 298). The same month, an MRI of the brain showing vasculitides was consistent with Plaintiff's complaints of migraine headaches (Tr. 328, 982). Dr. Robertson's notes state that Plaintiff asked to be taken off Oxycontin immediately (Tr.

-5-

610). Dr. Robertson opined that Plaintiff was unable to work until January, 2009 (Tr. 618). In November, 2008, Dr. Robertson opined that cervical and cognitive problems ruled out all jobs, even those limited to "menial" tasks (Tr. 321, 1115).

In January, 2009, Dr. Inwald found Plaintiff "disorganized and confused" (Tr. 668, 1153). In March, 2009, Dr. Inwald performed a neuropsychological evaluation, noting that Plaintiff exhibited significant short-term memory deficiencies (Tr. 272, 1159). Dr. Inwald noted that Plaintiff was also in severe "emotional distress" (Tr. 273, 1160). Dr. Inwald recommended additional cognitive therapy (Tr. 274-275, 1161-1162). In April, 2009, Plaintiff reported seizures and was hospitalized the following month after hitting his head during a seizure (Tr. 952, 1184, 1235, 1238). May, 2009 treating notes by Todd Best, M.D., note that Plaintiff's earlier work attempt was unsuccessful (Tr. 1238). Dr. Best prescribed a wrist brace for symptoms of CTS (Tr. 1241). He recommended continued 24-hour attendant care (Tr.1240, 1244, 1249).

In July, 2009, Plaintiff was admitted for six days of inpatient psychiatric treatment after allegedly expressing suicidal ideation (Tr. 955-960). A discharge summary states that his legal guardians were his parents and an attorney (Tr. 955, 1019). Hospital staff found that he was not a threat to himself or others but exhibited manic behavior (Tr. 955). He was assigned a GAF of 35-40[2] (Tr. 956). The discharge summary noted diagnoses of bipolar disorder and a closed head injury (Tr. 956). Treating notes state that Plaintiff was taking a muscle relaxer but no opiates (Tr. 957). Srinivasa R. Kodali, M.D. deemed Plaintiff "extremely manipulative" in providing reasons for immediate discharge, adding that Plaintiff

---

[2]

A GAF score of 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders,* 34 ("*DSM-IV-TR*")(4th ed.2000).

lacked insight into his condition (Tr. 959-960). Lee Marshall, D.O. performed a seizure evaluation, finding that Plaintiff should avoid heights, machinery, and unsupervised bathing or swimming (Tr. 1025). The following month, Richard B. Atkins, M.D. noted that Plaintiff was depressed due to failure to remember to pay his bills and the fact that he had been found legally incompetent (Tr. 962). Dr. Schecter noted that the recent involuntary commitment was attributable to a misunderstood joke Plaintiff made to a pharmacist (Tr. 968). Dr. Schecter observed that Plaintiff's gait and balance were normal but advised him not to drive (Tr. 968). In September, 2009 Dr. Best noted that Plaintiff was currently attending cognitive and physical therapy, opining that Plaintiff was disabled from all work (Tr. 1227-1228).

In October, 2010, Dr. Inwald found that Plaintiff was "unable to meet competitive standards" in remembering workplace procedures and maintaining concentration for two-hour segments (Tr. 1284). Dr. Inwald denied that substance abuse played a role in Plaintiff's limitations (Tr. 1285). The same month, Dr. Atkins found that Plaintiff was unable to meet competitive standards in all areas of concentration-related work skills (Tr. 1261, 1288). Dr. Best also opined that Plaintiff was "totally disabled" due to a traumatic brain injury (Tr. 1202-1203).

## 2. Non-Treating Sources

In August, 2008, Dr. Norman S. Miller, M.D. performed a one-time examination of Plaintiff, noting spontaneous speech and an appropriate mood (Tr. 362, 965). Dr. Miller observed that Plaintiff was able to recall past events without difficulty (Tr. 362). He found that Plaintiff had used opiates "addictively and regularly since at least 2004" (Tr. 364). Dr. Miller concluded that Plaintiff would be returned to his usual "cognitive functioning" upon

ceasing the use of opiates (Tr. 365).   He attributed Plaintiff's cognitive and back problems exclusively to opiate abuse (Tr. 366, 369).

In October, 2009, T.L. Tsai, M.D. performed a non-examining Psychiatric Review Technique on behalf of the SSA, finding the presence of organic, affective and anxiety disorders (Tr.  988, 990, 992).   Under the "'B' Criteria," Dr. Tsai found that Plaintiff experienced mild restriction in activities of daily living and moderate deficiencies in social functioning and concentration, persistence, or pace (Tr. 997).  Dr. Tsai, citing Dr. Miller's findings of long-term drug abuse, found that Plaintiff could nonetheless perform unskilled work (Tr. 999).  Dr. Tsai also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; work within a schedule, accept criticism; and respond appropriately to workplace changes (Tr. 984-985).

The same month, Tammy Nguyen completed a non-examining Physical Residual Functional Capacity Assessment on behalf of the SSA, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently, sit, stand, or walk for at least six hours in an eight-hour workday; and push and pull without limitation (Tr. 1001).  She found that Plaintiff was limited to occasional stooping, crouching, and rope, ladder, and scaffold climbing and frequent (as opposed to *constant*) balancing, kneeling, crawling, and ramp and stair climbing (Tr. 1002).  Nguyen limited Plaintiff to frequent overhead reaching on the right, but found the absence of visual or communicative limitations (Tr. 1003-1004).  She found that Plaintiff should avoid even moderate exposure to hazards such as heights or machinery (Tr. 1004).  Citing Dr. Miller's August, 2008 findings, Nguyen found Plaintiff's limitations partly attributable to opiate abuse (Tr. 1005).

In November, 2010, Pamela M. Harringshaw, Ph.D. performed a post-hearing

-8-

consultative psychological examination of Plaintiff at the request of ALJ Armstrong (Tr. 1269-1302). Plaintiff reported continuing short term and "working" memory problems, noting that his failure to turn off the stove created a kitchen fire on one occasion (Tr. 1272). He reported migraine headaches several times a week, intermittent dizziness, and double vision (Tr. 1272). He reported that he had not been taking Vicodin since March, 2010 (Tr. 1273). He stated that he worked as a fast food restaurant manager while completing graduate school (Tr. 1274). Dr. Harringshaw noted that Plaintiff stuttered, appeared anxious, and repeated "at least" 10 times that he wanted to return to work (Tr. 1274). Dr. Harringshaw observed "multiple medical and physical problems" as a result of the January, 2008 automobile accident (Tr. 1275). She observed further that Plaintiff "remain[ed] in serious denial regarding the severity of his mental functioning (Tr. 1275). Dr. Harringshaw found that Plaintiff was "unable to function independently" (Tr. 1276). She assigned him a GAF of 35, finding that he would be incapable of managing his benefit funds (Tr. 1278-1279). She stated that his prognosis for returning to work was "poor to extremely poor" (Tr. 1279). She found that Plaintiff experienced marked and extreme cognitive limitations (Tr. 1280).

Following, Dr. Herringshaw's examination, ALJ Armstrong ordered yet another mental evaluation, performed by Firoza B. Van Horn in January, 2011 (Tr. 1304-1319). Dr. Van Horn noted that Plaintiff exhibited "good energy" and understood the purpose of the evaluation (Tr. 1308). However, she found that Plaintiff was "easily distracted," requiring her to repeat questions (Tr. 1308). He expressed a desire to work (Tr. 1308). She found Plaintiff's frustration with his limitations consistent with "brain damaged individuals who are having difficulty coping with their limitations" (Tr. 1313). She assigned Plaintiff a GAF

of 62[3], finding that his cognitive problems did not prevent him from understanding, remembering, or carrying out "simple, repetitive tasks" (Tr. 1314).  She found  moderate concentrational limitations, noting that "he may not be able to focus effectively on what he is doing" (Tr. 1314).  She cautioned that Plaintiff's forgetfulness "could be a threat to himself or others" (Tr. 1318).  She found that substance abuse did not play a role in Plaintiff's limitations (Tr. 1318).

### C.    Vocational Expert Testimony

Taking into account Plaintiff's age, education, and work background, the ALJ posed the following question to VE Harry Cynowa, describing the work limitations of a hypothetical individual:

> [L]imited to light exertional duties, no work at unprotected heights, around dangerous moving machinery, open flames or bodies of water, and he's limited to . . . simple, unskilled, light work, no hazards (Tr. 74).

The VE testified that while the above described individual would be unable to perform Plaintiff's past relevant work, he could perform the light, unskilled jobs of visual inspector (12,500 positions in the regional economy); hand packager (15,000); and small products assembler (12,500) (Tr. 74).  The VE testified that if the individual were additionally precluded from "high speed type of thing . . . assembly line type work, where there's a high production quota or certain production quota," the visual inspector numbers would be reduced to (1,000); hand packer (2,500); and small products assembler (2,500) (Tr. 75).  The VE stated that the additional restrictions would not preclude work as an office cleaner (6,000) (Tr. 76).  The VE stated that if the same individual were off task more than 10

---

[3]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR*)(4th ed. 2000).

percent of the workday, all work would be precluded (Tr. 76, 81).

### D.     The ALJ's Decision

Citing Plaintiff's treating records, ALJ Armstrong found that Plaintiff experienced the severe impairments of degenerative disc disease status-post motor vehicle accident, residual effects of closed-head injury, seizure disorder and depression, but that none of the impairments met or equaled a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 21).  He found that Plaintiff experienced moderate restriction in activities of daily living, mild deficiencies in social functioning, and moderate deficiencies in concentration, persistence, or pace (Tr. 23).  ALJ Armstrong determined that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work with the following additional restrictions: "i) simple, unskilled work only, and ii) no work at unprotected heights, around dangerous moving machinery, open flames or bodies of water" (Tr. 24). Citing the VE's job findings, the ALJ found that while Plaintiff was unable to perform his past relevant work, he could perform the jobs of visual inspector, hand packager, and small products assembler (Tr. 36).

The ALJ adopted the findings of consultative examiner Dr. Van Horn's findings that Plaintiff's cognitive abilities were mildly impaired (Tr. 34).  He rejected Dr. Inwald's findings of severe cognitive limitations, noting that the treating source's opinion was not well supported by record as a whole (Tr. 34).

### STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable

-11-

mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy."

*Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  The Treating Physician Analysis

Plaintiff argues that the RFC found in the administrative decision did not reflect his full degree of limitation.[4] *Plaintiff's Brief* at 2-6, *Docket #11.*  Specifically, he contends that the ALJ erred in rejecting the disability opinions by Drs. Inwald and Atkins in favor of  Dr. Van Horn's one-consultative findings.  *Id.*

An uncontradicted, well supported treating source opinion "must be given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir.2009) (citing *Wilson v. Commissioner of Social Sec.,* 378 F.3d 541, 544 (6th Cir.2004)(internal quotation marks omitted));*Cole v. Commissioner of Social Security,* 661 F.3d 931, 937 (6th Cir. 2011).  Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.  *Wilson,* at 544.

The ALJ's treating physician analysis in this case founders on erroneous findings and mis-characterizations of the record. First, the treating records overwhelmingly support Drs. Inwald, Atkins, and Best's opinions that the January, 2008 closed head injury caused severe, if not disabling cognitive limitations.  The ALJ faulted Dr. Best's disability opinion  for its lack of specificity (Tr. 33 citing 1202-1203). However, Dr. Best's detailed treating notes

---

[4]

The RFC states that Plaintiff could perform exertionally light jobs limited simple, unskilled work only, and "no work at unprotected heights, around dangerous moving machinery, open flames or bodies of water" (Tr. 24).

from March, 2009 forward state repeatedly that Plaintiff required 24-hour attendant care and cognitive therapy due to limitations brought about by the automobile accident (Tr. 1237, 1240, 1244, 1249).

The ALJ's analysis of Dr. Inwald's October, 2010 disability opinion is even shakier. The ALJ acknowledged that "[a] substantial amount of evidentiary support exists for Dr. Inwald's opinion in the form of neuropsycholgical testing and cognitive therapy notes . . ." (Tr. 34). Notably, although the ALJ found that Dr. Inwald's 2008 evaluation of Plaintiff was undermined by Plaintiff's then prescription medicine misuse, he did not provide any grounds for rejecting Dr. Inwald's March, 2009 evaluation (Tr. 34). Instead of providing even one good reason for rejecting that evaluation, he relied on the adage that "the truth often lies between extremes," characterizing Dr. Miller's August, 2008 one-time consultative findings that Plaintiff's cognitive problems were due to solely to opiate abuse as one end of "the spectrum" and Dr. Inwald's disability finding at "the other" (Tr. 34). He found Dr. Van Horn's consultative finding as "the truth . . . between [the two] extremes" (Tr. 34).

However, the  use of Dr. Miller's August, 2008 evaluation as a guidepost is intrinsically problematic.  Earlier in the opinion the ALJ characterized Dr. Miller's opinion that Plaintiff's cognitive disorders were wholly attributable to opiate abuse as "a red herring" that was contradicted by a mental status examination conducted only 13 days later and by evidence of cognitive problems continuing long after the cessation of opiate use  (Tr. 30). Having already found that Dr. Miller's opinion was not entitled to any weight, the ALJ then inexplicably "balanced" Dr. Miller's meritless opinion against Dr. Inwald's well-supported treating March, 2009 findings in justifying his adoption of Dr. Van Horn's "happy medium" consultative findings (Tr. 34). The ALJ's unexplained conclusion that Dr. Inwald's opinion was "extreme" (or at least entitled to no more weight than Dr. Miller's far-fetched

interpretation of the treating records) is internally inconsistent with his earlier finding. It does not provide "good reasons" for the rejection of Dr. Inwald's March, 2009 findings.

### B. Other Errors in the Administrative Opinion

The ALJ's "adoption" of Dr. Van Horn's findings is additionally flawed. First, while Dr. Van Horn found that Plaintiff could perform "simple, repetitive tasks," she did not opine that he could perform *all* simple, repetitive work, in fact noting that Plaintiff's conditions could "affect his interpersonal relationships in an employment setting" (Tr. 1314). Significantly, neither the hypothetical question nor the RFC included limitations on interactions with coworkers or the public. Likewise, while Dr. Van Horn concluded that Plaintiff was easily distracted, unable to handle his own funds, ill equipped to handle "emotional stressors," and did "poorly" in the visual processing of information, such limitations were not included or even implied in either the hypothetical question or RFC (Tr. 1308,1311, 1315).

The administrative opinion is plagued by additional mis-characterizations of the record. While the ALJ found that Plaintiff "overstate[d]" his limitations, the treating and consultative records state exclusively that he minimized, rather than exaggerated his cognitive limitations in an effort to show that he was capable of returning to work (Tr. 22-23). The ALJ ordered a post-hearing mental evaluation by Dr. Herringshaw, but rejected her disability conclusion because it was "based largely on [Plaintiff's] subjective symptoms" (Tr. 32). However, Dr. Herringshaw's findings of severe cognitive deficits do not in fact appear to be based on Plaintiff's subjective claims of limitation. In her own words, her conclusions were based on her own observations of mental disorganization and the tendency to "ramble;" short term memory deficiencies; and the her review of the treating records (Tr. 1275, 1279).

-15-

Her observation that Plaintiff was "in serious denial" regarding his limitations and that he stated repeatedly that he wanted to return to work stands at odds with the ALJ's finding that she was unduly swayed by Plaintiff's allegations of limitation (Tr. 1275).

The ALJ's initial decision to order a post-hearing mental examination was unusual enough, given the strong record support for the disability claim. His weak rebuttal of Dr. Herringshaw's post-hearing conclusions, coupled with his unusual decision to order a *second* post-hearing consultative evaluation, supports the inference that he sought a consultative opinion more supportive of the non-disability determination. Moreover, as discussed above, Dr. Van Horn's "adopted" findings, read in their entirety, suggest a greater degree of limitation than stated in the RFC or hypothetical question. Finally, the ALJ's adoption of Dr. Tsai's non-examining findings is also highly suspect, given that Dr. Tsai admittedly based his conclusions on Dr. Miller's discredited findings that Plaintiff's problems were attributable solely to opiate abuse (Tr. 33, 999). Likewise, Nguyen's heavy reliance on Dr. Miller's erroneous findings casts doubt on her conclusion that Plaintiff was capable of light work (Tr. 1005).

While under the deferential substantial evidence standard, an ALJ need not support his findings with preponderance of the evidence, *Mullen, supra,* 800 F.2d at 545, "cherry picking" or disregarding favorable statements from a record that, as a whole, demonstrates disability as a result of a traumatic brain injury, amounts to a distortion of the record. "'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record" *Laskowski v. Apfel,* 100 F.Supp.2d 474, 482 (E.D.Mich.2000) (Roberts, J.)(citing *Cotter v. Harris,* 642 F.2d 700, 706 (3rd Cir.1981). "Substantial evidence cannot be based on fragments of the record." *Laskowski,* at 482.

-16-

### C.  A Remand for Benefits is Appropriate

The above discussed mistakes provide grounds for remand.  The final question is whether to remand for further fact-finding or an award of benefits.  The Sixth Circuit has held that it is appropriate to remand for an award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171 (6th Cir. 1994).  This transcript overwhelmingly supports the conclusion that Plaintiff is disabled as a result of a cognitive disorder, including disability opinions by treating sources Drs. Best, Atkins, Robertson, and Inwald and consultative source Dr. Harringshaw.  As discussed above, the findings of non-examining sources Dr. Tsai and Nguyen are largely invalidated by their erroneous reliance on Dr. Miller's discredited opinion.  A remand for benefits is therefore appropriate.

### CONCLUSION

For the reasons stated above, I recommend  that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment GRANTED, remanding this case for an award of benefits.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which

-17-

raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 26, 2013                          s/R. Steven Whalen_____
                                              R. STEVEN WHALEN
                                              UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on June 26, 2013, electronically and/or by U.S. mail.

                                              s/Michael Williams_____
                                              Relief Case Manager for the Honorable
                                              R. Steven Whalen